UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BETTY GRADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  NO. 2:05-CV-3 PPS |
| | ) |
| JOHN E. POTTER, Postmaster General | ) |
| of the United States Postal Service, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

After being stuck in the same position at the Gary Post Office for eleven years, Betty Grady felt that enough was enough. So in October 2000, she complained to the Postal Service's Equal Employment Opportunity office that she was being denied training and upward mobility. The Postal Service struck a deal with her. In exchange for dropping the charges, she was given a temporary detail in the Merrillville Post Office to improve her skill set for future job openings. The Merrillville detail, however, was a bust. She did not get along with her new supervisors, was not being trained, had difficulties with her new responsibilities, and failed to qualify for a pay increase. After eight months, she returned to her old job, and she is now retired.

Grady claims that the Postal Service retaliated against her for filing the 2000 EEO charge. This matter is now before the Court on Defendant's Motion for Summary Judgment. [DE 52]. Since Grady fails to meet her burden of proof under the direct or indirect methods, summary judgment is granted.

**FACTUAL BACKGROUND**

Grady started working in the Gary, Indiana Post Office in 1977. (DE 52-4 at 3, Tr. 8.)[1] By 1989, she had become a Supervisor in Gary's Computer Forwarding operations. (*Id.*, Tr. 9.) Grady stayed in that position for 11 years, and in October 2000, she complained to the EEO office that she was being denied training and promotional opportunities. (*Id.* at 5, Tr. 14.) That complaint was settled through mediation with Patty Mahomes, Manager of Post Office Operations. (DE 52-2 at 3-7.) As part of the settlement, Mahomes agreed to assign Grady to temporary detail as a Customer Service Supervisor so that she could gain experience that would qualify her for higher level positions. (*Id.*)

On December 2, 2000, Grady began her detail at the Merrillville Post Office (a substation of Gary). (DE 52-4 at 5, Tr. 16.) Her direct supervisor at Merrillville was Brenda Holmes. (*Id.*, Tr. 17.) Neither Mahomes nor anyone else from management ever informed Holmes about the EEO charge, but upon her arrival in Merrillville, Grady promptly told her new supervisor (Holmes) that the detail was a result of a settlement. (DE 52-3 at 13, Tr. 40.) When Grady arrived in Merrillville, Holmes purportedly told her "I'm glad Pat Mahomes is targeting you because now that will keep her off my ass." (DE 52-4 at 49-50, Tr. 193-94.)

Grady's detail at Merrillville got off to a rocky start. In January 2001 – about a month into the new job – she asked Gary Postmaster Michael Gaube if she could go back to her old job at Gary. (*Id*. at 19, Tr. 71.) Gaube, who had just been appointed Postmaster shortly before

---

[1] The Parties have filed numerous exhibits for the Court's consideration of this motion. To avoid confusion, I have cited to the document number and page number as the record appears in the CM/ECF system. Where I have cited to a deposition transcript, I have also included the transcript "Tr." page number.

2

Grady's request, was not aware of her prior EEO activity until Grady told him at that time. (DE 53 at 6.) Gaube denied Grady's request for immediate transfer and informed her new supervisor Holmes that Grady should stay in Merrillville at least until July when certain organizational tasks were completed. (DE 52-4 at 20, Tr. 74-75.)

Grady's relationship with Holmes was at the core of her problems in Merrillville. In her first performance review on February 6, 2001, Holmes stated that Grady's work was satisfactory during the first month, but began to decline as she was given more responsibility. (DE 52-2 at 16.) Then on March 5, 2001, Grady received a letter of warning from Holmes for failure to complete accurate flash reports on February 10 and February 17. (DE 52-2 at 8-9.) Flash reports are operational report cards that units must send to the regional district office on a weekly basis. (DE 52-3 at 18-19, Tr. 61-62.) The warning letter charges that Grady failed to report certain volumes on February 10 and reported incorrect volumes on February 17. (DE 52-2 at 8-9.)

Grady does not deny that these incidents occurred. (DE 52-4 at 8-9, Tr. 29-31.) But she complains that she was never trained to prepare customer service flash reports. (*Id.* at 7, Tr. 22.) Holmes believes she did not have to train Grady because Grady prepared flash reports in her position at Gary. (DE 52-3 at 26, Tr. 91.) Grady meanwhile insists that the flash reports she prepared at Gary are different from the ones she was required to prepare at Merrillville. (DE 56 at 3.) Grady also complains that she was disciplined for the February 10 incident, while the other Customer Service Supervisor at Merrillville, Greg Price, was not. (*Id.*) But Grady also admitted that Price was not working on February 10 so its difficult to see why he would be disciplined for that incident. (DE 52-4 at 11, Tr. 39.) And she blames another employee, Laura

3

Tipton, for giving her false information that led to the inaccurate report on February 17 and claims that Tipton was not disciplined. (*Id*., Tr. 41.) Holmes denies knowing that Tipton gave Grady false information. (DE 52-3, Tr. 95.) Grady appealed the warning letter via the internal review process, and her appeal was denied. (DE 52-4 at 10, Tr. 36.)

Holmes admits that her relationship with Grady deteriorated after this point. (DE 52-3 at 40, Tr. 146-48.) Soon after the flash report incidents, Grady requested several weeks of vacation. (DE 52-2 at 19.) Holmes denied these requests citing operational needs. (DE 52-4 at 18, Tr. 69.) So Grady went over her head to Gaube, who approved the requests. (*Id.*)

Grady also had trouble performing certain aspects of her new job at the Merrillville substation. For example, Grady was required to perform street observation of the mail carriers each day. (*Id.* at 11-12, Tr. 41-44.) When supervisors in the postal service perform this task with their own car, they get paid mileage. (*Id.*, Tr. 42.) Grady balked nonetheless claiming that she didn't have insurance on her car for this task. (*Id.*, Tr. 43.) Since Grady did not want to use her own car for street supervision, she asked if she could use a car from the motor pool in Gary. (*Id.* at 11, Tr. 41.) Holmes testified there were no motor pool cars available for this purpose. (DE 52-3 at 18, Tr. 60.) In fact, Holmes never asked the Gary Post Office whether Grady could use one of their cars. (*Id.*) Instead, Holmes told Grady she could use a right-hand drive delivery vehicle and arranged for training with a driving instructor. (DE 52-4 at 12, Tr. 43.) On April 5, 2001, Grady went out for training to use the delivery vehicle. (*Id.*, Tr. 45.) But she returned after less than an hour because she did not feel comfortable driving the delivery vehicle. (*Id.* at 13, Tr. 46-47.) Grady refused to drive the delivery vehicle, and since no other cars were made available to her, she did no street supervision during her time at Merrillville even though it was

4

part of her job duties. (*Id.*, Tr. 48.)

The problems did not end there. On June 4, 2001, at 8:15 a.m., Holmes noticed that the retail area of the Merrillville Post Office was not open and yelled at Grady "the store is not open." (*Id.* at 15-16, Tr. 54-58.) It was Grady's responsibility to open the retail area each day at 8:00 a.m., but Holmes did not discipline her for her tardiness. (*Id.*, Tr. 55.) Then on June 27, 2001, Holmes filled in for Grady because Grady was out sick. (*Id.* at 17, Tr. 64.) That day, Holmes found numerous pieces of mail that had not been processed from previous dates. (DE 52-3 at 23, Tr. 80.) Holmes investigated the matter by interviewing Grady and the mail carriers. (*Id.* at 25, Tr. 87-88.) She ultimately determined that Grady was responsible for 355 pieces of late mail and issued Grady another warning letter in lieu of suspension even though suspension was the next step in the Postal Service's progressive discipline policy.[2] (DE 52-2 at 10-11.) Grady appealed the warning letter and the internal review board found that the warning letter was justified. (*Id.* at 12-15.)

Meanwhile, throughout her time in Merrillville, Grady continued to ask Gaube if she could return back to her old position at Gary. Grady did not feel she was getting the training or experience she wanted. (DE 52-4 at 19, Tr. 72.) And she also contends that her eight month detail in Merrillville was exceptionally long. (DE 56 at 6.) So on July 10, 2001, Grady made a written request to Gaube to be transferred back to Gary. (DE 56-7.) A week later, Gaube replied to Grady that he could not accommodate her request at that time because of a shortage of delivery supervisors and the operational needs of the Postal Service. (*Id.*) Unhappy with the

---

[2] Grady notes that Mahomes, the manager who negotiated Grady's 2000 EEO settlement, signed this warning letter and her first evaluation in February 2001, along with Holmes. But neither party explains the relevance of her signature or otherwise suggests that Mahomes contributed in any way to these evaluations/warnings. (DE 56 at 14-15; DE 52-3 at 22, Tr. 74.)

5

news, Grady complained to Gaube's superior, District Manager Ken Braun. (DE 52-4 at 21, Tr. 78.) Braun granted her request, and she returned to Gary on August 25, 2001. (*Id.* at 20, Tr. 77.)

After Grady returned to Gary, Holmes prepared a performance evaluation for her time in Merrillville. (DE 52-2 at 17-18.) To no surprise, the evaluation was unfavorable. (*Id.*) Holmes cited Grady's failure to do street supervision, incomplete reports, mail delays, and lack of positive attitude. (*Id.*) Holmes also recommended that Grady be denied a merit pay increase for 2001 based on her unsatisfactory performance and discipline. (DE 52-3 at 30, Tr. 109.) Gaube followed Holmes's recommendation and denied Grady a pay increase for 2001. (DE 52-2 at 50.)

As time passed, things got worse between Grady and Gaube. According to Grady, Gaube held a grudge because Grady went over his head regarding her transfer. (DE 52-4 at 23-24, Tr. 89-90.) She claims that Gaube subsequently denied her permission to attend a management training course in April 2002 and told her that as long as he was manager in Gary, she would never get a management position because of her disciplinary file. (*Id.*) Grady and Gaube continued to have disputes regarding vacation and leave requests.[3] (DE 59 at 9-10; DE 56 at 20-21.) In October 2006, Grady retired from the Postal Service. (DE 52-4 at 2, Tr. 5.)

After pursuing another EEO charge against the Postal Service, Grady filed this lawsuit on January 6, 2005, claiming retaliation, harassment, discrimination on the basis of race, gender and age, and violation of First Amendment rights. Grady has since voluntarily withdrawn all counts

---

[3] Things got so bad in August 2002, that Gaube sent Grady a notice of proposed removal from the Postal Service for lying about personal leave and failing to submit medical documentation for medical leave. (DE 52-2 at 20-24.) The discipline charge was ultimately reduced to a "last chance" suspension via settlement between Grady and the Postal Service. (*Id.* at 33-35.) Since Grady agreed to release her claims against the Postal Service for this incident, and she does not now challenge the validity of that release, she is barred from asserting any claims based on these events. *Gonzalez v. Kokot*, 314 F.3d 311, 316 (7th Cir. 2002).

except her retaliation claim. (Plf. Mem, DE 56 at 8.)

## DISCUSSION

Grady alleges that Mahomes, Gaube and Holmes launched a "campaign of retaliation" against her for complaining to the EEO office about her lack of career advancement and training opportunities. (DE 56 at 7.) In particular, she claims that Gaube and Holmes treated her with hostility, unfairly disciplined her, and denied her training in order to frustrate the very purpose of her initial EEO charge. The Post Office says that Grady's problems at Merrillville were due to her own poor performance and attitude – not retaliation. The Postal Service therefore seeks summary judgment.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. The plain language of Rule 56© mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case on which that party will bear the burden of proof at trial. A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and draws all inferences in the light most favorable to the non-moving party." *McCoy v. Maytag Corp.*, 495 F.3d 515, 520 (7th Cir. 2007).

Title VII prohibits an employer from discriminating against an employee because "[she] has opposed any practice made an unlawful employment practice by [Title VII] or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under [Title VII]." *See* 42 U.S.C. § 2000e-3(a). A plaintiff can prove retaliation using either the direct or indirect method of proof. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007). Grady attempts both.

**A. Direct Method**

To prove retaliation under the direct method, a Title VII plaintiff must offer evidence that: (1) she engaged in a statutorily protected activity; (2) the defendant subjected her to an adverse employment action; and (3) a causal connection exists between the two events. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). The first requirement is readily met. Grady plainly engaged in statutorily protected activity when she filed an EEO charge that she was denied career advancement and training opportunities for some impermissible reason.

As to the second element, Grady says she suffered an adverse employment action via a series of workplace disappointments including: unfair warning letters, negative evaluations, inadequate training, denial of preferred work vehicle, no merit pay increase, denial of preferred vacation days, and delayed relocation to her old position in Gary. The Postal Services argues that these complaints – some of them plainly trivial – are not adverse employment actions, either individually or taken together. I need not decide that issue because Grady cannot demonstrate a causal link between those actions and her filing of an EEO complaint in 2000.

Grady attempts to make her case for a causal connection based on circumstantial evidence, which is, of course, perfectly permissible. *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Circumstantial evidence can be any type of proof that may allow for an inference of retaliation. *Id.* at 903. It can include things like suspicious timing, ambiguous statements, behavior towards other employees, unfavorable treatment compared to

8

similarly situated employees, and so on. *See Volovsek v. Wisc. Dept. Agric. Trade & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003).

Grady first argues that the fact that she was treated differently before and after her EEO is evidence itself of retaliatory motive. (Plf. Mem., DE 56 at 11.) But that's a common fallacy. Just because something occurs after the fact does not mean – without more – that it occurred because of the fact. So timing of events alone is not enough to establish a causal link. *See Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918 (7th Cir. 2000) ("[T]he mere fact that one event preceded another does nothing to prove that the first event caused the second."). Moreover, each event Grady complains of centered on her working relationship with Gaube and/or Holmes. Neither of these individuals worked with Grady before her EEO charge; so she cannot show that they treated her differently after her EEO charge. And Grady admits there is no evidence that Mahomes, the Postal Service Manager who was involved in the 2000 EEO mediation, told Gaube or Holmes to give Grady a hard time. (DE 52-4 at Tr. 212.) It may be true (if one believes Grady) that Gaube and Holmes were strict, unaccommodating and difficult to work for. But there simply is no evidence that Gaube and Holmes treated Grady as they did because of the EEO charge that she had filed several months earlier. And unfortunately for Grady, being a lousy boss is not a violation of federal law. *See Burlington Northern*, 548 U.S. at 68 ("Title VII . . . does not set forth a general civility code for the American workplace.").

In addition, Grady notes that Greg Price, the other Customer Service Supervisor at Merrillville, and Laura Tipton, the coworker who gave her faulty numbers, did not get in trouble for the deficient flash reports. She makes this point as circumstantial evidence that people who did not file EEO charges but who engaged in similar conduct were not disciplined the same way.

9

Where "a plaintiff claims that [she] was disciplined more harshly than a similarly situated employee based on some prohibited reason[,] the plaintiff must show that [she] . . . engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 688 (7th Cir. 2007) (internal citations omitted). The problem for Grady is that she cannot draw any meaningful similarities between her conduct and the conduct of her coworkers. Price was not at work on February 10 when Grady submitted her first faulty report. So he was not in any way similarly culpable for her mistake that day. And although Tipton gave Grady some bad numbers on February 17, Grady (unlike Tipton) had messed up the flash reports two weeks in a row. Grady thus cannot show that Tipton's error was comparable to Grady's consecutive flash report infractions. In light of these mitigating and differentiating circumstances, it cannot be said that either of these coworkers were similarly situated to Grady. Grady also asserts that she was "singled out" for the incident involving the 355 pieces of delayed mail. But "singled out" in comparison to who? Grady makes no attempt to identify other individuals who were similarly situated to her who allegedly committed a similar transgression but was not reprimanded for it.

     The fundamental problem with Grady's claim is that nothing in the record links her troubles at Merrillville to her EEO complaint. There is no evidence that Mahomes, the Postal Service Manager who was involved in the 2000 EEO mediation, had it in for Grady. Nor is there any evidence that Mahomes played a part in Grady's problems at Merrillville. Mahomes in fact denies that she played any role in Grady's temporary detail other than sending Grady to Merrillville in the first place (at Grady's request). (DE 52-2 at 37-38.) With regard to

10

Mahomes, Grady only points to Holmes's comment when Grady arrived in Merrillville: "I'm glad Pat Mahomes was targeting you because now that will keep her off my ass." (DE 52-4 at 50, Tr. 194.) In order for an ambiguous statement to be probative of discrimination, the statement must have been made "around the time of, and in reference to, the adverse employment action complained of." *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) (internal citations omitted). Grady provides no context at all regarding this statement. It is not clear what adverse action the comment is in reference to, or how it supports Grady's theory that Mahomes and Holmes were scheming in concert against Grady. If anything, Holmes's stray comment suggests the contrary – that Mahomes and Holmes did not get along.

Taken together, the circumstantial evidence that Grady points to in an effort to establish her case under the direct method does not support an inference of a retaliatory motive. Summary judgment is therefore appropriate under the direct method of proof.

### B. Indirect Method

The indirect method requires a plaintiff to first establish a prima facie case that she: (1) engaged in a protected activity; (2) was meeting the employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees that did not engage in the protected activity. *Nichols*, 510 F.3d at 785. If a plaintiff establishes a *prima facie* case, the burden then shifts to the employer to present evidence of a legitimate, non-retaliatory reason for the adverse employment action. *Id*. If the employer supplies such a reason, the plaintiff must show that the stated reason is a pretext for the retaliation. *Id*. Pretext "means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue*

11

*Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000).

The second prong and the pretext question merge here because the issue is the same – whether the postal service is lying about its business expectations and Grady's performance. *Pierick*, 510 F.3d at 688. In her role as Customer Service Supervisor, the Postal Service points to three job expectations where Grady missed the mark: submitting accurate flash reports, ensuring timely processing of mail, and conducting street supervision. On the first point, Grady contends she was improperly disciplined for the flash cards because she was never trained to do them. While that may be true, Holmes testified that she expected Grady to get the flash cards right because Grady had done flash reports in her previous position. Whether or not Holmes was wrong to presume that Grady could handle the task, Grady offers no evidence to suggest that Holmes's presumption was phony. Second, Grady takes issue with the fact that she was blamed for the 355 pieces of delayed mail. It goes without saying that ensuring the timely processing of mail is a legitimate expectation of the Postal Service. Grady says the screw-up was not her fault, but she has no proof one way or the other, and she cannot show that the charge was fabricated. Recall, as well, that a postal administrative hearing officer considered the issue and found the discipline that was meted out to be appropriate. Third, there is nothing impermissible about Holmes's requirement that Grady use a delivery vehicle instead of the vehicle of her choice for her street supervision duties. Grady was provided training, she failed that training and the task of observing carriers was never done. It is not retaliation when an employee cannot or will not do her job.

Finally, for reasons already discussed, Grady also cannot demonstrate the fourth prong – that she was treated less favorably than similarly situated employees. Therefore, she fails to

meet her prima facie burden under the indirect method.

## CONCLUSION

No reasonable jury could find that the postal service retaliated against Grady. Therefore, Defendant's Motion for Summary Judgement [DE 52] is **GRANTED**. The clerk shall **ENTER FINAL JUDGMENT** in favor of the United States Postal Service and against Plaintiff Betty Grady. The clerk shall treat this civil action as **TERMINATED**. All further settings in this action are hereby **VACATED**.

**SO ORDERED**.

ENTERED: November 25, 2008

                                          s/ Philip P. Simon
                                          PHILIP P. SIMON, JUDGE
                                          UNITED STATES DISTRICT COURT